## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-CR-58-JED |
| | ) | |
| GREGORY SINCLAIR CONNOR, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

The Court has for its consideration the following motions: Defendant Gregory Connor's various motions to dismiss the indictment in whole or in part (Doc. 17; Doc. 19; Doc. 30; Doc. 34; Doc. 46; Doc. 63; Doc. 71); his various motions to suppress certain statements and other evidence (Doc. 24 Doc. 43); his motions in limine (Doc. 21; Doc. 62); and the government's motions in limine (Doc. 40; Doc. 58; Doc. 61). The Court heard evidence and argument related to these motions during a hearing held on October 30 and 31, 2019.

## I.     Background

The investigation giving rise to this case began with a shipment of seven vials carrying botulinum toxin A, a compound better known under its medicinal brand name, Botox. The package, shipped via international mail in January 2017, was set to enter the country via the Customs and Border Protection facility in New York City when it caught the eye of inspectors. Suspecting the package contained unauthorized prescription drugs, the agency detained the shipment and referred it to the Food and Drug Administration for further investigation. The box did not identify the sender, but the shipping label indicated that the parcel was bound for the neurology clinic of Dr. Gregory Connor in Tulsa, Oklahoma,

A subsequent examination of the parcel's contents confirmed the initial suspicion of customs inspectors, according to the testimony of the FDA officer who performed the examination. According to the officer, information on the vials' packaging indicated that Allergan, the manufacturer, had boxed and labeled the Botox for distribution outside the United States. The FDA has approved the sale of Botox in the domestic market, but the drug is only considered to be FDA-approved when it is packaged and labeled according to FDA regulations. Because Allergan packages the drug differently for different markets, the FDA considers Botox packaged for sale abroad to be an unapproved drug when imported into the United States.

The ensuing investigation into Dr. Connor culminated with the Second Superseding Indictment (Doc. 53), which accuses Dr. Connor of engaging in a scheme to defraud Medicare by buying Botox at a discount on the international market and then billing Medicare for the full reimbursement rate. According to the indictment, Dr. Connor was not entitled to seek reimbursement at all because Medicare only reimburses for FDA-approved drugs and the Botox he used did not qualify.

In connection with this alleged scheme, the indictment charges Dr. Connor with 36 counts of healthcare fraud under 18 U.S.C. § 1347. Each of the healthcare fraud counts, enumerated in the indictment as Counts 1 and 7–41, relates to a specific Botox treatment that Connor administered and subsequently billed to Medicare.

Count 2 of the indictment charges Dr. Connor with receiving a misbranded drug with the intent to defraud in violation of 21 U.S.C. §§ 331(c) and 333(a)(2).

Counts 3–6 charge Dr. Connor with aggravated identity theft under 18 U.S.C. § 1028A(a)(1). According to the indictment, Dr. Connor used the names and Medicare numbers of four patients without lawful authority in connection with the alleged healthcare fraud scheme. Each

count of identity theft relates to a patient who received one of the Botox treatments forming the basis for the healthcare fraud counts.

## II.     Motions to Suppress Statements and other Evidence

Two of Dr. Connor's pretrial motions seek to suppress evidence on constitutional grounds. One seeks to exclude evidence, direct and indirect, obtained as a result of the FDA's search of the January 2017 Botox shipment. (*See* Doc. 24).  The other seeks to exclude statements and other evidence that the government obtained under allegedly false pretenses. (*See* Doc. 43). "When factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d). The discussion below shall serve as the Court's essential findings on the defendant's motions to suppress.

### A.     Summary of the Evidence

FDA Consumer Safety Officer Cosmon Barrett testified as to the origin of the investigation into Dr. Connor. After customs intercepted the January 2017 shipment bound for Dr. Connor's office, Barrett conducted a warrantless search of the shipment's contents and determined that the Botox was not packaged as required by the FDA for the U.S. market. He then forwarded his findings to a colleague in the FDA's Office of Criminal Investigations, which opened a file on Dr. Connor. Several days later, on January 24th, the agency sent a letter to Dr. Connor's office saying the shipment had been detained because its contents "d[id] not appear to be in compliance" with several listed code sections, but the letter made no reference to a criminal investigation. (Plaintiff's Exhibit (PX) 5).

When the FDA received no response to the detention notice, the agency refused to admit the package into the country. Packages refused entry into the United States are returned to their

country of origin, according to Barrett. The FDA sent notice of the refusal to Dr. Connor's office on February 15, 2017. (PX 6).

Special Agent Daniel Allgeyer testified that, after receiving the criminal-investigation referral, he and another agent went to Dr. Connor's Tulsa practice on February 1st. After checking in at the front desk, they remained in the waiting room until Connor came out. The agents introduced themselves, and Connor led them back to his office to speak in private. Once in Connor's office, Allgeyer testified, he informed Connor that the FDA had reason to believe that someone had sent him a package containing foreign unapproved medical products. Connor said he recently received a letter saying something to that effect.

Allgeyer testified that he then began to ask Connor about the Botox he used in his practice. According to Allgeyer, Dr. Connor said he had three to five patients who currently received Botox treatments, which he sourced from a Canadian company called Northwest Pharmaceuticals at a price of about $480 per vial.

Allgeyer then asked Dr. Connor if he had any Botox on hand. At this, Connor went into another room where the Botox was stored in a refrigerator and returned with a single boxed vial. After going over the various telltale markings on the vial's box, Allgeyer told Connor that the Botox appeared to be FDA approved. Before ending the interview, Allgeyer asked, "do you mind if I take a look inside your refrigerator just for -- you know, my boss is going to want to know if I looked around." Connor responded, "Sure. Follow me." Inside the refrigerator, Allgeyer said, he found seven vials of what he identified as "foreign unapproved medical product."[1]

---

[1]     The FDA considers Botox packaged for sale and distribution outside the FDA-approved supply chain to be "foreign unapproved medical product." The government uses the term "foreign Botox" as a shorthand.

Allgeyer testified that, at about this time, Dr. Connor's business manager, Judy Hurst, joined the interview. When Allgeyer told her what Connor had said about the office's Botox purchasing, Hurst confirmed that the company was Canadian but corrected Connor as to the name. The company is called MedicaDepot, not Northwest Pharmaceuticals, she said.[2] The company's price was also more like $380, not $480, and Dr. Connor had eight to ten patients that received the drug, not three to five. Allgeyer testified that, when he asked why the office bought some Botox from a U.S. supplier and some from MedicaDepot, Hurst said some patients' private insurers required the office to buy from a particular pharmacy. For those on Medicare, they bought from MedicaDepot, Hurst said.

Allgeyer asked Hurst if anything about MedicaDepot had raised any "red flags." There was something that she did find "a little bit weird," she said. A few days earlier, someone from MedicaDepot had called to say that customs had stopped the office's most recent order at the border. In order to ensure that replacement shipment would make it through, the person said, MedicaDepot would send it to her personal address. The replacement shipment had just arrived, Hurst told Allgeyer. Those were the vials he had found in the refrigerator.

Allgeyer asked Hurst if the office had any receipts for the orders it received from MedicaDepot. She said they did not, but she kept the company's American Express statements, which she annotated with the word "Botox" next to the payments made to MedicaDepot. Hurst showed Allgeyer the statements and also walked him through the office's Medicare reimbursement paperwork. At Allgeyer's request, she agreed to make copies of the relevant documents.

---

[2]    Dr. Connor testified that he was simply guessing at the name and did not even know whether "Northwest Pharmaceutical" actually exists. There does appear to be an international pharmacy with a similar name—Northwest Pharmacy—that claims to do business out of Canada. *See* www.northwestpharmacy.com.

Before he left, Allgeyer asked Dr. Connor to sign two documents. One form was a waiver stating that Connor "having been advised of [his] right to refuse" granted consent to Allgeyer and his partner to search the clinic and seize "any and all property, materials, documents, or other items that may be used in connection with their law enforcement and investigative purposes, including, but not limited to, any and all misbranded and/or adulterated medical products." (PX 1). Allgeyer testified during cross examination that, even though the form's language implies that Connor had been previously "advised of [his] right to refuse," Allgeyer never actually told Connor or Hurst that they could deny the agents' requests to inspect the clinic's Botox stock or files.

The other form, an "Acknowledgment," stated that Allgeyer had "advised the interviewee" about various federal statutes governing the purchase and administration of prescription drugs, including the statute defining the crime of receiving misbranded drugs. (PX 2). Apart from handing him the form, which was dense with legalese, Allgeyer did explain to Connor that he could be criminally prosecuted for his Botox-purchasing practices.

Allgeyer testified that he gave Dr. Connor enough time to read the statements and that Connor appeared to do so before signing them and handing them back. Allgeyer did not leave Connor copies of the forms.

The next day, February 2nd, Allgeyer and his partner returned to Dr. Connor's office briefly to get the copies Hurst promised to make and to ask some follow up questions. Noting that MedicaDepot charged only $380 per unit, Allgeyer asked Connor why his office requested a $600 reimbursement from Medicare. Dr. Connor's response, according to Allgeyer: "Allergan vials cost $600, so we just went with the $600."

Investigators returned to Dr. Connor's office for a third and final time on June 1. On that day, Allgeyer told Connor and Hurst that they could ask him to leave at any time and that they did

not have to answer any questions if they did not want to. It appears that the primary purpose of the visit was to obtain a written statement summarizing the information Connor and Hurst had given during the prior interviews. Although Connor and Hurst signed the statement, it was written by Allgeyer. The form stated, in pertinent part, as follows:

> This information is given by me to let the facts be known. I have not been forced into providing this information, nor have I been promised anything in relation to this investigation.
>
> On this date, Special Agent(s) *Daniel Allgeyer and Ana Richardson* [and] *Randall House* [Health and Human Services Office of the Inspector General] of the FDA-OCI interviewed me.
>
> This interview concerned my knowledge of: *MedicaDepot.com, Debby [last name unknown] and Dr. Gregory Connor / Neurological Center of Oklahoma's purchase of Botox from MedicaDepot from 2012 until February 2017. Dr. Connor administered Botox received from MedicaDepot via online and over-the-phone orders for patients of neurological disorders. MedicaDepot charged between $360 - $385 per vial and all orders were received at 6585 S. Yale, Tulsa, OK, with exception of one time when an order was received at Judy Hurst's residence in early Feb. 2017. A blast-fax was received by MedicaDepot on or about 09/18/12 and ordering began via online account. Within the last year, MedicaDepot designated us as a "Gold" Customer, and phone orders only were allowed. When requesting the reimbursement from Medicare, we requested the allowable amount. MedicaDepot provided no invoices for orders; we always verified the purchase via our American Express Credit Card. It does not appear that MedicaDepot ever overcharged the price that was discussed.*

(PX 3) (emphasis added to indicate the portions of the form filled in by Allgeyer). Dr. Connor and Ms. Hurst signed their initials next to each line.

On June 20th, Allgeyer and two other investigators went to Ms. Hurst's residence to interview her alone. After she invited them in, they sat down to talk in her kitchen. They asked many of the same questions they had asked before. "Most of the answers didn't change," Allgeyer testified. Before the agents left, "We told Ms. Hurst she was not a target of the investigation at this time, but we did not want that to become – we didn't want that to change."

Allgeyer testified that neither he nor his fellow agents ever threatened or intentionally misled Dr. Connor or Ms. Hurst, and that he never made any promises in order to obtain their

cooperation. He denies ever telling Connor or any other suspect, "Things will go better for you if you cooperate with us."

When Dr. Connor and Ms. Hurst took the stand, they painted a decidedly different picture regarding their interactions with investigators. Although they testified that they cooperated with the investigators voluntarily, Connor and Hurst said they had done so under false pretenses. They testified that Allgeyer initially told them that FDA was investigating illegal Canadian Pharmacies and wanted their help to run a "sting" operation on MedicaDepot.

Dr. Connor testified that the agents began the interview with an aggressive posture, saying they "came in and basically said, 'We're investigating Canadian companies and we want to inspect your Botox.'" The way Allgeyer said it, Connor testified, "implied that he had the right because he was coming from the FDA." Instead of demanding to see the Botox immediately, however, Allgeyer went with Connor back to his office and spent the next several minutes talking to him about Canadian pharmacies that were shipping unapproved prescription drugs into the United States, going into great detail about their business model, including how the pharmacies were really fronts for Middle Eastern money interests.

Throughout this process, Connor testified, he had no reason to think that he was the subject of the investigation. He testified that he never received the detention notice that the FDA sent after it intercepted the January 2017 shipment of Botox, and he denied saying that he had received it when asked by Allgeyer.

Connor and Hurst also provided a materially different account of how Allgeyer came to know of the allegedly unapproved Botox in the refrigerator. Connor and Hurst testified that, when Hurst joined the conversation, the only vial of Botox that Allgeyer had was the one Connor had brought to him. Hurst said that Allgeyer asked her if there was any other Botox, and she told him

about the shipment MedicaDepot sent to her house. She then retrieved the Botox from the freezer and gave it to the agents. Asked whether Dr. Connor knew that this lot of Botox was in the freezer, Hurst said, "Probably not. I mean, it was back up in the freezer, so he couldn't see it." Hurst testified that Dr. Connor did not participate in the Botox ordering process or regularly handle the shipments.

At the end of the first meeting with investigators, Connor said, he signed the waiver and acknowledgment forms without reading them because he had patients waiting. In any case, he said, he did not think it mattered because the agents already had the Botox they were looking for and the target of the investigation was the Canadian pharmacy, not him. Allgeyer never explained what they meant and did not leave him a copy. On cross-examination, Connor said he was given an opportunity to read the forms but had chosen not to.

Between the February and June meetings with investigators, Hurst and Connor testified, they were still under the impression that they were cooperating with an FDA investigation into Canadian pharmacies. That began to change, they said, when the agents returned in June and asked them to sign the formal statement described above. Connor said that he did not pay much attention to the content of the statement at the time because he did not know its purpose. He was still operating under the assumption that he was cooperating with an investigation into the pharmacy. Nevertheless, he said, after the agents left, he and Hurst had misgivings, so they decided to include an addendum to their statement in the package of documents that the agents had requested. The note, written by Hurst, read as follows: "Here is all the records you requested. We were wanting to add to the form we filled out yesterday. That since MedicaDepot packing was in Allergan box we were not aware this was not FDA approved." (DX 6).

Although Hurst testified that she and Dr. Connor agreed to write the note together, Allgeyer testified that he specifically asked Hurst about the note when the agents interviewed her alone at her house. During that interview, he testified, she said that she alone decided to write the note and had not conferred with Dr. Connor about it beforehand.

Hurst testified that the agents were generally polite and reported only one occasion where she felt that they were trying to coerce her. As the agents were wrapping up the June 20th interview in her kitchen, she said, they made a veiled threat. "They told me that I had a beautiful home and I had a nice car sitting out there, and they would hate to have – for me to lose what I had. So if I had anything additional to say about Dr. Connor, this was the time to do it." Allgeyer denied making the remark.

**B.      Motion to Suppress Evidence from the January 2017 Search (Doc. 24)**

This motion seeks to suppress any evidence obtained, directly or indirectly, from the search of the January 2017 shipment of Botox. Dr. Connor argues that the evidence should be suppressed because the FDA searched the package without a warrant.

The Fourth Amendment protects against unreasonable searches, and courts determine whether a search was reasonable by weighing the degree to which the intrusion was necessary to promote legitimate government interests. *United States v. Pacheco*, 884 F.3d 1031, 1041 (10th Cir. 2018). Warrantless searches are generally unreasonable unless an exception applies. *Id.* at 1041–42.

In this case, the government executed its search as the package entered the country via international mail. When a search is conducted at the border rather than the interior, "the Fourth Amendment's balance of reasonableness is qualitatively different . . . ." *United States v. Uribe-Galindo*, 990 F.2d 522, 525 (10th Cir. 1993) (quoting *United States v. Montoa de Hernandez*, 473

U.S. 531, 538 (1985)). In *United States v. Ramsey*, the Supreme Court said that border searches are effectively reasonable per se:

> That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration.

431 U.S. 606, 616 (1977).

It is clear, then, that the Constitution did not require the government to obtain a warrant, or even to have probable cause, before inspecting the contents of the January 2017 shipment. *See id.* Hence, the evidence obtained during the search is not subject to the exclusionary rule, and the motion is **denied.**

## C.     Motion to Suppress Statements and Other Evidence (Doc. 43)

Connor seeks to suppress statements and evidence that investigators obtained through "the use of fraud, trickery, deceit and subterfuge." (Doc. 43 at 1).

The Fifth Amendment right against self-incrimination and the Due Process Clause require a confession to be voluntary in order for it to be admitted into evidence. *United States v. Cash*, 733 F.3d 1264, 1280 (10th Cir. 2013). A defendant's confession is involuntary when the government's conduct, threats, or promises cause his will to be overborne. *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002). In determining whether a statement is voluntary, a court must consider the totality of the surrounding circumstances, including the characteristics of the accused and the details of the interrogation. *Cash*, 733 F.3d at 1280. Relevant considerations include: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to any physical punishment." *U.S. v. Lopez*, 437 F.3d 1059, 1063–64 (10th Cir. 2006). Whether law enforcement officers made improper promises of leniency

or engaged in deception during the interrogation process are also factors. *See id.* at 1064 (leniency); *McGregor v. Gibson*, 219 F.3d 1245, 1254 (10th Cir. 2000) (deception). The burden is on the government to prove that a confession was made voluntarily. *United States v. Muniz*, 1 F.3d 1018, 1021 (10th Cir. 1993).

The Fourth Amendment right against unreasonable searches and seizures imposes similar requirements. Consent operates as an exception to the general rule that a warrantless search is presumptively unreasonable, but the fruits of a consensual search are admissible only if the consent was freely and voluntarily given. *United States v. Latorre*, 893 F.3d 744, 756 (10th Cir. 2018). Like the voluntariness of a confession, the voluntariness of consent to a search is considered in light of the totality of the circumstances. *Id.* Relevant considerations include:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*Id.*

### 1. Dr. Connor's Statements

Several of the relevant considerations weigh in favor of voluntariness. Dr. Connor, who was in his late 50s at the time of the investigation, is a highly educated medical doctor; he was not in custody during the interviews, which were brief and informal; and he was not subject to any kind of physical punishment or duress.

Other factors, however, weigh against voluntariness. For instance, Dr. Connor gave investigators a substantial amount of information before he was ever informed of his constitutional rights. It was not until the June 20 interview that Special Agent Allgeyer told Connor and Ms.

Hurst notice that they had the right not to answer questions. By then, Connor had already admitted to buying Botox at discount from abroad and then billing Medicare for the full amount.

Additionally, Dr. Connor and Ms. Hurst testified that the FDA deceived them about the purpose of its investigation in order to elicit their cooperation, a claim the government has not denied. (*See* Doc. 48 at 4–5). When Special Agent Allgeyer was asked directly whether he told Connor that the FDA wanted his help with an investigation into Canadian pharmacies, Allgeyer equivocated, saying "possibly" and "I don't remember."

Finally, Special Agent Allgeyer also made statements that arguably qualify as promises of leniency. Dr. Connor testified that Allgeyer repeatedly told him that, "If we cooperated everything would go well for us."

Nevertheless, it cannot reasonably be said that Dr. Connor's will was overborne. Even if Allgeyer obscured the true target of his investigation, he truthfully disclosed that the FDA was investigating the distribution of unapproved drugs into the United States market from abroad. Connor was, therefore, aware of the investigation's fundamental nature. Moreover, the Court is not convinced that Connor spoke to the investigators because Allgeyer promised leniency in exchange for cooperation. A promise that "everything would go well" is too vague and noncommittal to be relied upon. *See United States v. Rodebaugh*, 798 F.3d 1281 (10th Cir. 2015) (concluding that the statement "If you work with us, we'll go easy on you" did not make the defendant's confession involuntary). Because Dr. Connor's will was not overborne by the circumstances of his interrogation, the Court finds that his statements were voluntary.

### 2. *Ms. Hurst's Statements*

Admitting involuntary statements into evidence violates a defendant's right to due process, even when the statements were made by a third party rather than by the defendant himself. *United*

*States v. Dowell*, 430 F.3d 1100, 1107 (10th Cir. 2005). The standard for determining voluntariness is the same, whether the statements were made by the defendant or a third party. *Id.* When a defendant challenges the voluntariness of another's statement, however, the burden is his to carry, rather than the government's. *Id.*

Ms. Hurst gave the bulk of her statements to investigators under largely the same circumstances as Dr. Connor. Accordingly, with respect to the statements she made while at Dr. Connor's office, the Court finds that she gave those statements voluntarily.

Regarding the statements she made during the interview at her home, these were also given voluntarily. If, as Hurst testified, Allgeyer implied that the FDA would come after her house and vehicle unless she cooperated, that would certainly call into question the voluntariness of her statements. Hurst testified, however, that the threat came at the end of the interview, when she had given the investigators all the information she had. As unseemly as such an alleged threat might be, it is irrelevant with respect to the admissibility of her prior statements. Hence, because Hurst's will was not overborne by the circumstances under which she made the statements, the Court finds that she made them voluntarily.

### 3.    *Seized Evidence*

Dr. Connor's motion seeks to exclude any evidence seized from his office, including the alleged foreign unapproved Botox. Connor does not dispute that the agents had his consent to search the premises, but he argues that his consent was invalid.

Here, the relevant circumstances are largely the same as those discussed regarding the voluntariness of Dr. Connor's and Ms. Hurst's statements. There was no detention, physical mistreatment, or display of police weapons, but Dr. Connor and Ms. Hurst claim that law

enforcement deceived them about the nature of its investigation, and, according to Dr. Connor, Allgeyer made an implicit claim of lawful authority to search Dr. Connor's practice.

Before addressing those concerns, it should be noted that the waiver form that Dr. Connor signed is largely irrelevant to the Court's analysis. By the time the agents provided him the form, they had already obtained the Botox and inspected sensitive documents related to their investigation.

### a. Deception

"When government agents seek an individual's cooperation with a government investigation by misrepresenting the nature of that investigation, this deception is appropriately considered as part of the totality of circumstances in determining whether consent was gained by coercion or duress." *United States v. Harrison*, 639 F.3d 1273, 1278–79 (10th Cir. 2011). The alleged deception in this case, however, is different in both kind and degree than the kind of deceit that renders consent involuntary. For example, in *United States v. Harrison*, one of the cases Dr. Connor relies upon, the Tenth Circuit held a search to be unconstitutional where federal agents obtained the defendant's consent by telling him that they had reason to believe there was a bomb in the apartment. *Id.* at 1276. The court determined this ruse was impermissible because it leveraged the defendant's concern for his own safety to obtain consent. Other cases cited by Connor involved deception similarly calculated to give the impression of an imminent danger. *See, e.g.*, *United States v. Vazquez-Velazquez*, No. 1:11-CR-212-TCB-GGB, 2012 U.S. Dist. LEXIS 35867 (Report and Recommendation) (Brill, Mag. J.) (N.D. Ga. Feb. 23, 2012) *adopted by* 2012 U.S. Dist. LEXIS 35853 (N.D. Ga. Mar. 16, 2012); *United States v. Parson*, 599 F. Supp. 2d 592 (W.D. 2009). The FDA's alleged ruse did not involve this kind of coercion.

### b. Claim of Lawful Authority

Dr. Connor testified that Allgeyer made a declarative statement about his desire to see Dr. Connor's Botox and that Allgeyer's tone implied that he, as an FDA agent, had the right to inspect the Botox without Connor's consent. Viewed in isolation, such a declaration might qualify as an implicit claim of lawful authority sufficient to vitiate consent. The surrounding circumstances, however, cast doubt on Dr. Connor's interpretation of events. When the agents arrived at his office, they did not demand to be admitted immediately; they waited for Dr. Connor to summon them from the waiting room. After Dr. Connor invited them back, they spoke to him for several minutes about the reason for their visit before asking to see his Botox. Given their observance of such niceties, a reasonable person would not assume the agents had the legal authority to search the premises without permission.

The evidence indicates that Dr. Connor freely gave the investigators consent to search his office. Likewise, to the extent that Ms. Hurst's consent played a role, the Court finds that it too was voluntary. Given that Dr. Connor appears to have been present during most, if not all, of the interaction and did not protest when Hurst retrieved the Botox or helped the agents access billing records, the agents were entitled to rely on her apparent authority to give consent.

### 4. *Conclusion*

For the reasons explained above, the Court finds that Dr. Connor and Ms. Hurst made their statements and gave their consent to search voluntarily. The motion is **denied.**

## III. Motions to Dismiss

### A. Motion to Dismiss (Doc. 17)

Broadly stated, this motion argues that the indictment should be dismissed because (1) the charges are not stated with sufficient specificity, and (2) the government will not be able to prove its case at trial. "An indictment is sufficient [under the Constitution] if it sets forth the elements of

the offense charged, puts the defendant on fair notice of charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997). Here, the indictment lays out the elements of each offense and describes Dr. Connor's alleged scheme in detail. It is more than sufficient to put Dr. Connor on notice and enable him to assert a double jeopardy defense should the government fail to prove its case. As for Connor's second argument, the strength of the government's evidence is a question for the jury. *See United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) ("Generally, the strength or weakness of the government's case, or the sufficiency of the government's evidence to support a charge, may not be challenged by a pretrial motion."). The motion is **denied**.

### B.      Motion to Dismiss (Doc. 19)

This motion argued that the original indictment should be dismissed because it violated the statute of limitations. The government subsequently restructured the allegations in a superseding indictment such that all the alleged offenses now fall unambiguously within the applicable statute of limitations, rendering Dr. Connor's argument moot. The motion is **denied.**

### C.      Motion to Dismiss (Doc. 30) and Motion to Deem Confessed (Doc. 71)

Dr. Connor seeks dismissal of the indictment on the grounds that the government abused the grand jury process and engaged in prosecutorial misconduct. In a related motion, Dr. Connor claims that the government failed to file a timely response to the motion to dismiss and requests that the Court deem the alleged abuse and misconduct "confessed by the government." (*See* Doc. 71). However, the government filed a response on July 31st, (Doc. 49), and the response was timely under the scheduling order in place at the time. (*See* Doc. 42). The defendant's Motion to Deem Confessed is therefore **denied.**

Turning to the merits of Dr. Connor's motion to dismiss, the motion appears to be directed toward the grand jury proceedings leading to the first indictment filed in this case. The current indictment was returned pursuant to subsequent grand jury proceedings. Because Dr. Connor has made no effort to connect the alleged misconduct to the current indictment, his motion is moot.

Moreover, even if the Court were to assume that the alleged conduct undermined the current indictment, Dr. Connor's motion would still fail.[3] Much of the motion is dedicated to arguing that the government's presentation of evidence to the grand jury was unfairly prejudicial or based on conclusory statements by investigators rather than hard facts. Connor appears to misunderstand the nature of a grand jury proceeding. "The whole history of the grand jury institution demonstrates that a challenge to the reliability or competence of the evidence supporting a grand jury's finding of probable cause will not be heard." *Kaley v. United States*, 571 U.S. 320, 328 (2014) (internal quotation marks omitted). Where, as here, a grand jury has determined that probable cause exists, that determination is conclusive unless an error in the proceedings prejudiced the defendant or the government engaged in prosecutorial misconduct so flagrant that it compromised the independent judgment of the grand jury. *United States v. Hillman*, 642 F.3d 929, 933–34 (10th Cir. 2011). The transcript of the proceeding shows no such error, and the government's conduct cannot be characterized as flagrant abuse.

Dr. Connor also argues that the indictment should be thrown out because the government presented "false testimony" and failed to present exculpatory evidence. The Tenth Circuit has

---

[3]    Dr. Connor cites to a grand jury transcript attached to the motion as Exhibit 2. (*See* Doc. 30). It appears, however, that the transcript was not properly attached to the motion as filed to the Court. Consequently, for the purposes of evaluating the claims made in this motion, the Court has relied on the transcript of the proceedings that Dr. Connor entered as Exhibit 8 during the hearing held on this matter. (DX 8).

established a procedure for determining whether a grand jury's finding of probable cause will stand despite allegations of false inculpatory evidence or omitted exculpatory evidence.

> Procedurally we approach the probable cause question this way. Where false statements are alleged to have been *included* in an arrest warrant affidavit or grand jury testimony, probable cause is determined by setting aside the false information and reviewing the remaining truthful facts. Similarly, where true information has been allegedly and unlawfully *omitted* from an affidavit or grand jury proceeding, the existence of probable cause is determined by examining the affidavit or proceedings as if the omitted information had been included and inquiring if the affidavit or proceedings would still have given rise to probable cause.

*Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (brackets and quotation marks omitted). If, after this process, there remains "a substantial probability" that the suspect committed the crime, the grand jury's finding of probable cause will stand. *Id.*

Special Agent Allgeyer made two factual claims to the grand jury that were directly contradicted by testimony during the hearing: (1) that Connor ordered the Botox and (2) that Connor wrote checks to MedicaDepot. In reality, Hurst ordered the Botox and paid for it with an American Express card whose monthly bills were paid off with checks written by Connor.

Neither of these inaccurate statements is sufficient to undermine the grand jury's finding. Allgeyer truthfully told the grand jury that Hurst had told investigators that Dr. Connor knew where the Botox was coming from. The assertion that Connor ordered the Botox himself and wrote checks directly to MedicaDepot were presented as corroborating evidence. Even if these statements were omitted, Allgeyer's testimony regarding Hurst's statement is sufficient to support the grand jury's finding that Dr. Connor acted knowingly.

Connor also argues that the government failed to inform the grand jury that Connor told investigators that he did not know he should not have been buying Botox from abroad. Even if this statement were presented to the grand jury, the other evidence supported a finding of probable cause.

In sum, even when the allegedly false inculpatory testimony is excised and exculpatory evidence added, the grand jury could still have found a substantial probability existed that Dr. Connor committed the alleged offenses. The motion to dismiss is **denied**.

### D.    Motion to Dismiss (Doc. 46)

This motion argues that the indictment should be dismissed because it fails to allege—and the government would be unable to prove—that Dr. Connor deprived his patients of their intangible right to honest services. This argument is futile.

The Tenth Circuit has clearly stated what the government must prove in order to establish a violation of 18 U.S.C. § 1347.  The government must show that the defendant "knowingly and willfully" executed or attempted to execute a scheme to defraud a healthcare benefit program or a scheme to gain control of a health care benefit program's money or property through false pretenses, representations, or promises. *United States v. Franklin-El*, 554 F.3d 903, 908 (10th Cir. 2009).

In other words, a defendant charged with healthcare fraud under § 1347 is not accused of depriving someone of the right to honest services; he is accused of depriving the government of its money or property. The indictment, therefore, did not need to allege that Dr. Connor deprived his patients of honest services in order to properly allege healthcare fraud. The motion is **denied.**

### E.    Motion to Dismiss (Doc. 63)

This motion seeks dismissal of the indictment on the grounds of vindictive prosecution and selective prosecution.

#### 1.    *Vindictive Prosecution*

Vindictive prosecution occurs when the government retaliates against a defendant for exercising a constitutional right, such as the right to present a defense. *United States v. Ray*, 899

F.3d 852, 860 (10th Cir. 2018). To succeed on a claim of prosecutorial vindictiveness, a defendant must show either actual vindictiveness or presumptive vindictiveness. *Id.* Actual vindictiveness occurs when the government's decision to prosecute was a "direct and unjustifiable penalty for the exercise of a procedural right." *Id.* Where there is no evidence of actual vindictiveness, a defendant must establish presumptive vindictiveness by showing that "there is a realistic or reasonable likelihood" that the prosecutorial conduct that would not have occurred "but for hostility or punitive animus toward the defendant because he exercised his specific legal right." *Ray*, 899 F.3d at 860. The Tenth Circuit has never applied this rule to find presumptive vindictiveness in the pretrial context. *Id.* at 860–61. The addition of new counts to an indictment, where there is probable cause to support them, is typically within the bounds of prosecutorial discretion. *Id.* at 860.

Other than the sequence of events leading to the indictments, Dr. Connor offers no evidence directly linking the government's decision making to his refusal to plead guilty. Thus, he has not shown actual vindictiveness.

As for presumptive vindictiveness, his argument boils down to the following chain of events: When he refused to plead to guilty to one count of healthcare fraud and one count of receiving misbranded drugs, the government indicted him on those charges and added the identity theft counts. Then, when he sought to have that indictment dismissed, the government secured superseding indictment alleging 41 counts.

Dr. Connor has offered nothing to show that the government's decision to seek the initial six count indictment amounts to anything more than traditional prosecutorial discretion. With respect to the superseding indictment, the additional counts came about as the result of Connor's own statute of limitations defense. The initial indictment charged a single count of healthcare fraud, but the alleged scheme dated back to September 2012. Dr. Connor argued that the five-year

statute of limitations on healthcare fraud begins to run as soon as the scheme is executed, and a scheme to defraud is executed when the victim surrenders the fraudulently induced payment. Consequently, he argued, the statute of limitations began to run on the government's healthcare charge in 2012, the minute the minute Dr. Connor cashed a Medicare check for a treatment involving allegedly unapproved Botox. As a result, the indictment, secured in February 2019, was out of time. In order to defang this argument, the government secured a new indictment that alleged a separate count for each Medicare payment made within the five-year limitations period. This suggests the government filed the superseding indictment to avoid a procedural bar, not to punish Dr. Connor for his refusal to plead guilty. Because Dr. Connor has not shown a reasonable likelihood that the government made its charging decisions out of animus caused by his exercise of constitutional rights, he has failed to establish that the charges against him are the result of vindictive prosecution.

### 2. *Selective Prosecution*

Dr. Connor's selective prosecution argument also fails. The Due Process Clause of the Fifth Amendment forbids making the decision to prosecute "based on an unjustifiable standard such as race, religion, or other arbitrary classification." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Here, Dr. Connor points out that prosecutors have declined to prosecute similarly situated defendants, but he fails to identify what "unjustifiable standard" might have led the government to prosecute him while looking the other way with respect to others who engaged in the same conduct.

The motion is **denied.**

### F. Motion to Dismiss the Forfeiture Allegation (Doc. 34)

This motion, which requests dismissal of the indictment's forfeiture "count," is premature. As the Federal Rules of Criminal Procedure make clear, the forfeiture allegation is not a count at all. Its purpose is to give the defendant notice of the government's intent to pursue forfeiture as part of the punishment should the defendant be convicted. *See* Fed. R. Crim. P. 32.2. In the event Dr. Connor is found guilty, he will be entitled to dispute the forfeiture at a hearing held for that purpose. *Id.*

The motion is **denied.**

## IV.    Motions in Limine

### A.    Defendant's Motion in Limine (Doc. 21)

This motion seeks to preclude the government from presenting argument or evidence related to the statements that Dr. Connor and Judy Hurst made to investigators. In support of that motion, Connor points to the so-called corpus delicti rule.[4] Drawing its name from a Latin phrase meaning "body of the crime," the doctrine holds that a confession is insufficient to support a defendant's conviction unless there is independent proof that the crime actually occurred. *See Corpus Delicti*, Black's Law Dictionary (11th ed. 2019); 29 Am. Jur. 2d *Evidence* § 761 (2019). Connor argues that, absent the statements he and Ms. Hurst made about their Botox procurement and billing practices, the government has no independent evidence that a crime occurred. Consequently, he argues, the government should be precluded from referencing those statements at trial. This argument has no merit.

For one, the corpus delicti doctrine operates as a rule about the reliability of uncorroborated confessions. *See United States v. Shunk*, 881 F.2d 917, 919–20 (10th Cir. 1989). It is not a rule

---

[4]    Connor also references his constitutional arguments, but these were presented separately in Motion to Suppress (Doc. 43), which the Court analyzed *supra*.

about the admissibility of confessions. Moreover, the doctrine, which grew out of an era when torture routinely led to spurious confessions, is so anachronistic that one circuit has gone so far as to say that it "no longer exists in the federal system." *Id.* at 919 (citing *United States v. Kerley,* 838 F.2d 932, 939 (7th Cir. 1988)). To the extent the rule retains some vitality, Connor fails to cite a single case where a court has relied on the corpus delicti rule to bar a defendant's confession at trial. The motion is **denied.**

B. **Defendant's Motion in Limine (Doc. 62)**

Defendant's Motion in Limine (Doc. 62) is divided into separately numbered items. The Court addresses them in kind.

*Item No. 1*: Dr. Connor asks the Court to preclude the government from presenting evidence or argument related to the government's search of the 2017 shipment intercepted in New York. For the reasons explained above, this evidence is admissible, and the motion is **denied** as to this item.

*Item No. 2*: Dr. Connor asks the Court to preclude the government from presenting evidence or argument related the statements Judy Hurst made to investigators, arguing that such statements are hearsay. During the hearing held on this matter, the government argued that Ms. Hurst's statements are admissible because she is an unindicted coconspirator. That argument falls flat.

The basic definition of hearsay is an out of court statement offered to prove the truth of the matter asserted in the statement. *See* Fed. R. Evid. 801(c). The Federal Rules of Evidence, however, exclude from this basic definition statements made by the defendant's coconspirator "during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). It is unclear how a statement made to identified federal agents could be construed as being made "in furtherance of

the conspiracy." Thus, to the extent the government intends to introduce Hurst's statements, it cannot rely on a coconspirator theory to evade the hearsay prohibition. Nevertheless, the Court cannot predict how the government intends to introduce her statements or for what purpose, so a blanket prohibition is inappropriate at this time. The motion is **denied** as to this item.

*Item No. 3*: Dr. Connor asks the Court to preclude the government from presenting any evidence or argument relating to any statement

(1) made by "FDA agents or anyone else";

(2) to Special Agent Allgeyer;

(3) asserting "that Neurological Center of Oklahoma, Dr. Connor or Judy Hearst were ordering foreign Botox."

Connor has offered no grounds for his claim that such statements should be prohibited or described the manner in which he believes the government will attempt to offer such statements. The motion is **denied** as to this item.

*Item No. 4*: Dr. Connor asks the Court to to preclude the government from presenting evidence or argument relating to statements made by Judy Hurst regarding "Debbie at MedicaDepot." This motion appears to be duplicative of Item No. 2.  The motion is **denied** as to this item.

*Item No. 5*: Dr. Connor asks the Court to to preclude the government from presenting evidence or argument relating to "statements Dr. Connor made." Dr. Connor is the defendant in this case. His statements are not hearsay under the Federal Rule of Evidence 801(d)(2)(A). The motion is **denied** as to this item.

*Item No. 6*: Dr. Connor asks the Court to preclude the government from presenting evidence or argument relating to "any information contained in the Office of the Inspector General Office of Investigation Report of Conversation (Bates Number 4639)."The Court has no

information about this report or its contents, as a copy was not attached to this motion. The motion is **denied** as to this item.

*Item No. 7*: Dr. Connor asks the Court to preclude the government from presenting evidence or argument relating to "how much Neurological Center of Oklahoma paid for Botox it is charged with ordering." Such information constitutes relevant evidence. The motion is **denied** as to this item.

*Item No. 8*: Dr. Connor asks the Court to preclude the government from presenting evidence or argument relating to the consent waiver that Dr. Connor signed at the end of his first interview with investigators. This form, though relevant to the Court's inquiry regarding admissibility of Dr. Connor's statements, has limited relevance, if any, to questions within the jury's purview. The motion is **granted** as to this item.

*Item No. 9*: Dr. Connor asks the Court to preclude the government from presenting evidence or argument relating to the statement of facts Dr. Connor signed after being told that he was under no obligation to answer questions and could tell the agents to leave at any time. As explained above, Dr. Connor made this statement voluntarily. The motion is **denied** as to this item.

*Item No. 10*: Dr. Connor asks the Court to preclude the government from presenting any evidence or witness testimony "that the Botox came from MedicaDepot from 2012 to 2017." The Court will apply the Federal Rules of Evidence, including Rule 1002, better known as the "best evidence rule." The motion is **denied** as to this item.

*Item No. 11*: Dr. Connor asks the Court to preclude the government from presenting evidence or argument relating to what information was or was not included on the labels and package inserts of the Botox that Dr. Connor's practice received during the period of the alleged scheme. Because the Botox vials and their packaging have long since been discarded, Dr. Connor

seeks to preclude any circumstantial evidence offered to prove that the Botox did not arrive in the required packaging. It is up to the jury to determine what weight to give such evidence. The motion is **denied** as to this item.

*Item No. 12*: Dr. Connor asks the Court to preclude the government from presenting evidence or argument that uses the term "foreign Botox." The Court agrees that the use of the term "foreign Botox" has the potential to be unduly prejudicial. To date, the government has not presented any evidence that Allergan manufactures two different varieties or classes of Botox. Describing Botox packaged for sale abroad as "foreign Botox" implies that the drug itself is different rather than merely its packaging.

Nevertheless, the Court recognizes that the government needs some kind of shorthand to refer to Botox that, though an authentic Allergan product, bears packaging that distinguishes it from Botox distributed and sold through the approved supply chain. The Court, therefore, will permit the government to use the term "foreign Botox," so long as the government makes it clear to the jury what this term means. The motion is **denied** as to this item.

*Item No. 13*: Dr. Connor asks the Court to preclude the government from discussing or introducing into evidence any information relating to assault and battery charges brought against Dr. Connor but ultimately dismissed. This motion is uncontested. The motion is **granted** as to this item.

*Item No. 14*: Dr. Connor asks the Court to preclude the government from discussing or introducing into evidence information pulled from Medicare's claims database. Connor argues that the government should be required to introduce the "actual claim forms." According to the government, all Medicare claims are made through an electronic claims-submission system, which creates a record of each claim in a central database. Consequently, the spreadsheet that the

government plans to introduce consists of the information Dr. Connor submitted when he filed his claims. In other words, the spreadsheet is not a summary of the data; it is the data. The motion is **denied** as to this item.

Item No. 15: Dr. Connor asks the Court to prohibit the government from calling any witness to testify as to the FDA's rules and regulations. Some reference to the rules and regulations is inevitable, but the government will not be permitted to present legal opinion as fact. Nevertheless, because it is not yet clear how the government plans to introduce this evidence, the motion is premature. If and when Dr. Connor feels that the government has crossed the line, he may reassert his objection. The motion is **denied.**

Item No. 16: Dr. Connor asks the Court to prohibit the government from presenting evidence or argument that Dr. Connor is "greedy or corrupt." Such a broad prohibition is untenable. The motion is **denied** as to this item.

Item No. 17: Dr. Connor asks the Court to prohibit the government from introducing evidence or otherwise presenting information pertaining to the temporary suspension of Dr. Connor's medical license. Such evidence could be admissible as rebuttal testimony should Dr. Connor call character witnesses to testify as to his pertinent character trait. The motion is **denied** as to this item.

###     C.     Government's Motion in Limine (Doc. 40)

The government asks the Court to preclude Dr. Connor from presenting any argument or evidence regarding "specific instances of the defendant's good conduct and quality patient care." This request is overbroad. Some evidence qualifying as a "specific instance" of conduct or patient care may be relevant to the crimes alleged. If Connor attempts to elicit testimony or present

evidence that does no more than bolster his character in the eyes of the jury, the government is free to reassert its objection at trial. The motion is **denied**.

###### D.      Government's Motion in Limine (Doc. 58)

This motion seeks to preclude Dr. Connor from presenting any argument or evidence regarding "the government's prosecutorial discretion or charging decisions." To the extent Dr. Connor would seek to delve into his plea negotiations or the various iterations the indictments against him, those issues are irrelevant. The motion is **granted.**

###### E.      Government's Motion in Limine (Doc. 61)

The government asks the Court to preclude Dr. Connor from presenting any argument or evidence regarding "irrelevant policy issues and/or speculative changes to federal law." This request is overbroad. Normative claims about the fairness of existing law and how it should be changed are clearly irrelevant, but some evidence related to the law and the way it is enforced may be relevant to the issue of Dr. Connor's intent.

The Court will withhold ruling on this issue until it becomes clear what kind of evidence Dr. Connor plans to introduce.

SO ORDERED this 15th day of November, 2019.

_____

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT